IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRAD ROBERT MILLER,<br><br>                     Petitioner,<br><br>      vs.<br><br>CRAIG KOENIG, Warden, Correctional Training Facility-Soledad,[1]<br><br>                     Respondent. | No. 2:15-cv-01365-JKS<br><br>MEMORANDUM DECISION |

Brad Robert Miller, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Miller is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at the Correctional Training Facility-Soledad. Respondent has answered, and Miller has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On November 23, 2012, Miller was charged with the murder of his long-time friend Eric McGhee. The information also included a previously-convicted felon in possession charge. On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Miller and the evidence presented at trial:

> **Prosecution Evidence**
>       In 2009, [Miller] lived and worked in Montana with his cousin, Stuart Simonson. At trial, the parties stipulated that "[i]n December 2009 Simonson asked [Miller] to leave his property and [Miller] did, in fact, leave the premises and no longer worked with Simonson. During February of 2010 [Miller] left Montana for California and moved in with Eric McGhee."[FN2]

---

    [1]    Craig Koenig, Warden, Correctional Training Facility-Soledad, is substituted for Scott Frauenheim, Warden, Pleasant Valley State Prison. FED. R. CIV. P. 25(c).

FN2.     Except as otherwise noted, date references are to events that occurred in 2010.

[Miller] was supposed to stay with McGhee at his house in Roseville for only "[a] month or so." At the time, Erina McGhee—the victim's wife—was in Russia for several months to take care of personal issues. [Miller] and McGhee had been good friends for several years and had visited each other when they lived in different states.

McGhee had shared custody over Logan and Molly, his two teenage children from a previous marriage. Both Logan and Molly were close to their father and communicated with him at least every three days. Molly testified it would be unusual for her father to take more than a day to return a telephone call from her or Logan. McGhee said goodbye to his children before leaving on any business trip.

McGhee regularly communicated with his work supervisor by cell phone or text message. They routinely talked several times a day. McGhee was good at returning messages left for him by his work supervisor—usually calling back within an hour.

During trial, the parties stipulated Simonson sent McGhee an e-mail on March 5, in which he stated: "Eric, please read the string of messages below. I know that [Miller] is down there in Sacramento area. He's threatening to kill people. For his sake he needs to get help. Please help." The attachment to Simonson's e-mail reflected the following communications:

At 8:00 p.m. on March 5, [Miller] sent the following e-mail to Simonson: "I don't know why you decided to fuck me so bad, but when I come back to town I suggest you ste[e]r clear of me. I am a man with nothing left to lose, and a pension for your ass . . . . I have a feeling I will find you just the same . . . . I will look you in the eyes as they haze over." [Miller] followed this up with: "You wished nothing but harm on me. You fuck. You did so here. Expect it back. You have more than yourself to worry about you arrogant bastard." "See you soon you backstabbing fuck." [Miller] followed this up with: "Be a smartass, you won't when you look into my eyes."

The next day, Simonson responded: "Not being a smartass. You should just consider the threats you are making. It is not mature or appropriate. I don't wish harm on anyone." Shortly after, Simonson added: "I think these death threat messages need to stop. You should move on with your life instead of making it worse."

McGhee and [Miller] took Logan target shooting on March 14. [Miller] brought his own gun, which he used with aim that impressed Logan. Logan recounted that [Miller] "seemed very skilled with [his gun] and was able to hit, I believe, a target that we had 25 yards out almost dead on every time . . . . I saw him as a very skilled and accurate shooter."

Logan testified that on March 21, McGhee "walked in back to the house to find [Miller] drunk as a duck with the barrel of the gun in his mouth." McGhee "took the gun away from [Miller] after calming him down" and then transported [Miller] to a hospital "to go in detox because of too much drinking."

On April 5, McGhee sent an e-mail to Simonson that stated in pertinent part: "Stuart, Hi. I know that it has been a while since you wrote this and I hope that the hate mail has stopped. Apparently [Miller] was sending those when he was drunk and with his current situation it causes blackouts. So I doubt that he'd remember sending them, not that . . . he could deny sending them. Anyway, as far as I can tell, he has stopped drinking, and he is getting help. I have been taking him to the doctor and the counselor." McGhee added a postscript that implored: "And please, do not let him know I am writing on his behalf as there are still some anger issues and although I have been placed in the middle I am not trying to stir the pot."[FN3]

> FN3. Immediately after these e-mails were read to the jury, the trial court admonished: "You may consider the evidence that defendant made these statements or sent these e-mails . . . for the limited purpose of determining victim Eric McGhee's state of mind and/or his relationship with the defendant at or about the time of the killing. You may not consider this evidence for any other purpose."

Despite the hopeful tenor of McGhee's e-mail to Simonson, [Miller] continued to drink excessively. As the month of April progressed, McGhee's relationship with [Miller] frayed.

[Miller] was frequently drunk when Molly and Logan visited McGhee. McGhee told [Miller] not to drink in front of the children. [Miller] yelled back that alcohol was expensive and he did not want it poured down the drain. Once when [Miller] was drunk, he wrestled with Logan in a "hurtful" manner that would have injured Logan if he had not already been involved in wrestling and other school sports.

Logan was at McGhee's house on April 11 when [Miller], in a drunken stupor, yelled, "I will kill you. I will kill you all." [Miller] "was obviously having nightmares of some sort" and was scaring Logan. Logan testified, "I feel like that's when my dad decided to have him leave the house the next weekend." Logan remembered that McGhee "took us back to my mom's house and dropped us off like he normally would and said that he was planning to kick [Miller] out of the house later that week because he was going on a business trip to LA the weekend of the 17th, and I didn't know what date he was planning on leaving. Although, I know that it was supposed to be a weekend trip, and he told me that he was planning on disassembling [Miller's] gun and hiding it as well as kicking him out of the house. And at that point I was only under the impression that he was kicking him out for the weekend."

McGhee hired Angelina Dawson as a masseuse three times, with the last occasion occurring on April 13. After the massage on April 13, McGhee went to a bar with Dawson where he complained about [Miller's] drinking problems. McGhee explained he had a "definite plan" to stage "an ultimatum and intervention" for [Miller]. McGhee had been arguing with [Miller] about whether [Miller] could continue staying in the house. [Miller] either had to "clean up his act" or leave before Erina returned from Russia.

3

Dawson never saw McGhee again after April 13. McGhee wrote a review of Dawson's last massage that was posted on April 18. Reviews on the Website for which it was submitted take from zero to seven days to be posted.

Erina testified she told McGhee several times that [Miller] had to move out of the house. McGhee responded, "'Just please get healthy, and I will take care of the business, and I will do anything to get him out of the house.'" On the evening of April 14, McGhee told Erina [Miller] was aware she was scheduled to return on the 20th of that month. During that long-distance conversation—the last between McGhee and Erina—McGhee said [Miller] had left the house and "he was gone."

The prosecution's theory of the case was that [Miller] murdered McGhee on the morning of April 15. To this end, the prosecution introduced evidence McGhee sent his last text message at 8:49 a.m. on April 15. He last spoke with his supervisor at 9:26 a.m. McGhee and his supervisor were coordinating on the tasks McGhee was going to accomplish that day. At 10:00 a.m., McGhee made his last financial transaction at his local bank where he deposited a check. Phone records showed McGhee last used his cell phone at 10:35 a.m. from a location at or near his house.

Shortly after McGhee last used his cell phone, his neighbor, Mary Butler, heard two loud gunshots emanate from his house. Another neighbor, Tammy Kalinwoski, was awakened from a nap when she heard at least two gunshots.

Although friends and family members called and sent McGhee numerous text messages after 10:00 a.m. on April 15, none was answered. McGhee did not show up for a scheduled business meeting in Los Angeles on April 17. McGhee's supervisor at the time later testified he became concerned because it was the first time McGhee had ever failed to show up. McGhee's children noted he did not call them as he invariably did before leaving on a business trip. Although McGhee's family and friends continued to call him repeatedly after he disappeared on April 15, [Miller] did not call McGhee again after 7:58 a.m. on that day.

On the evening of Friday, April 16, a neighbor heard broken glass being thrown into McGhee's garbage can.

McGhee's neighbor, Julianne Thomas, was surprised he never contacted her about taking care of his dog prior to his trip to Los Angeles. On Saturday morning, April 17, Thomas heard scraping noises that sounded like boxes or lawn furniture were being moved in McGhee's back patio. Thomas went over to feed McGhee's dog and rang the doorbell. After 20 seconds of waiting, she let herself in with a key. She was greeted by two dogs—McGhee's and [Miller's]. After petting them, Thomas saw [Miller] on the staircase and said to him, "Oh, I wasn't expecting you to be here." Thomas testified [Miller] "wasn't responding right away, and he kept looking to the back of the house. [¶] And he finally said, 'Oh, I decided not to go.'" Thomas asked if he was taking care of the dogs and, after a pause, [Miller] responded affirmatively. [Miller] asked "which neighbor" Thomas was and she explained where she lived. Thomas then left.

Also on April 17, Molly sent [Miller] a message via Facebook to inquire about her father. [Miller] replied that McGhee "went to LA. Haven't heard from him either, [l]et you know." Molly responded, "Thanks. We think he might have lost his phone.

We're still unsure though." [Miller] did not respond though he was in possession of McGhee's phone.

McGhee's family members became sufficiently alarmed that Martin Tanihana, the husband of McGhee's ex-wife, drove to McGhee's house to check on him. Tanihana saw McGhee's Toyota Camry parked in the driveway and [Miller] walking out of the front door of the house. Tanihana asked about McGhee, and [Miller] responded that he had not seen McGhee since April 15. Tanihana asked [Miller] to contact him if [Miller] heard from McGhee, and [Miller] agreed. [Miller] then went back inside the house and shut the door.

Around 2:00 p.m. on April 17, Roseville police officers arrested [Miller] for driving under the influence. [Miller] was driving McGhee's Toyota and had McGhee's cell phone with him. [Miller] was confrontational with the police and his blood alcohol level measured .28 percent. During the booking process, [Miller] listed McGhee as his emergency contact. However, [Miller] did not call McGhee. Instead, [Miller] called a friend, Dawn Lewis, to ask if she would bail him out of jail.[FN4]

> FN4. [Miller] pled no contest to two counts of driving under the influence of alcohol as charged in a separate case, with one of the counts relating to his arrest on April 17. (Veh. Code, § 23152, subd. (a).) [Miller] was sentenced to serve six months for each conviction, ordered to run concurrently with the sentence imposed in this case.

On Sunday, April 18, Tanihana returned to McGhee's house with McGhee's ex-wife, their two children, and Molly. Tanihana noticed the Camry was no longer in the driveway but McGhee's Mercedes was still inside the garage. At that point, Tanihana realized McGhee had not driven to the airport to go on his business trip. As they walked into the backyard, they saw pieces of McGhee's glass dining room table in the garbage can. Molly climbed through the pet door at the back of the house and unlocked the nearby sliding door. They saw remnants of McGhee's dining room table in the kitchen area. McGhee's wallet and eyeglasses were sitting on the kitchen counter. The eyeglasses were broken. The wallet contained McGhee's identification, credit cards, and $200 in cash. Due to poor eyesight, McGhee was incapable even of walking around the house without his glasses. The house was cold and "smelled like rust, like metallic." The house was completely dark and most of the window coverings were closed. The thermostat was in the off position. They exited and immediately called the police.

Roseville police officers arrived shortly thereafter, at around 6:00 p.m., and conducted a welfare check of McGhee's house. The police found McGhee's body, cold to the touch, in a bedroom closet. The blanket that had been wrapped around the body had dried blood on it.

Subsequent investigation revealed no signs of forced entry into the house. For lack of any indications of burglary, police suspected that "the person involved with the murder of Eric McGhee probably was a resident inside and was well-known to him."

Evidence collected inside McGhee's house showed a significant clean-up effort. A garbage bag found inside the house contained a heavily blood-stained mat, bloody

5

cloths, paper towels, vodka bottles, and glass fragments. A vacuum cleaner had blood on it and contained glass shards, carpet fibers, dirt, and plaster. Next to the trash can in the yard stood cardboard with what appeared to be blood stains.

The evidence also showed [Miller] tried to clean himself of blood. Inside the washing machine located in McGhee's house, police found [Miller's] set of keys, an unexpended .380–caliber bullet, and bloody clothing consistent with [Miller's] size. [Miller's] right foot appeared to have "caked on" blood stains. A swab of the blood found on [Miller's] right foot tested positive for McGhee's DNA.

One of [Miller's] keys opened a padlocked gun case found in McGhee's master bedroom. Next to the gun case was a box of .380–caliber bullets with 10 rounds missing from the 50–round box. Inside the gun case, [Miller's] .380–caliber Bersa semiautomatic handgun was found without its magazine. Stains and smudges on the ammunition box and padlock tested presumptively positive for blood. Police found the magazine underneath a dog bed nearby where [Miller] slept. The magazine contained five unexpended .380–caliber bullets of the same type as the bullet found in the washing machine and the ammunition box. DNA testing of the gun's surface indicated a match with [Miller's] DNA profile.

[Miller's] "unkempt bedding" was found in the loft area of the house. Around that area of the house, Sergeant Douglas Blake found that "[a]ll of [Miller's] items had kind of been conglomerated, packed up, and were at the top of the stairs right next to the bathroom where he had located a number of visible signs of blood on the hot water handle, on the towel drying rack." A nearby "laundry hamper had all of [Miller's] clothing and paperwork, [with] signs of visible blood there."

An autopsy was performed on McGhee's body at 10:45 a.m. on Monday, April 19. The forensic pathologist found the body exhibited fully developed rigor mortis, but was unable to determine whether the rigor mortis was increasing or decreasing. The ambient temperature to which the body is exposed is the most important variable in determining the rate at which rigor mortis manifests. However, no one measured McGhee's body temperature when discovered or the ambient temperature of the room from which his body was removed. McGhee's body was refrigerated at the morgue prior to the autopsy.

The forensic pathologist had a difficult time determining McGhee's time of death, explaining: "His case was very complicated because there w[ere] some contradictions in terms of the lividity and the rigor mortis and also one result that came back as a result of toxicology." The minimal blanching corresponded to a stage of lividity that suggested the time of death might have ranged from eight hours to more than a day before the autopsy. A blood test revealed the presence of beta-phenethylamine (PEA), which signals decomposition of a body. However, the level of PEA was not tested because it does not accurately establish time of death. Nonetheless, the presence of PEA signaled McGhee had been dead for several days, possibly since April 15. Due to the contradictory indications concerning time of death, the pathologist believed that "extrinsic factors" such as the time when the victim was last heard from most likely provided the best indication of when McGhee died.

McGhee's body had abrasions around the left eye and contusions to his face that were consistent with being hit in the face while wearing eyeglasses. The body also had contusions and abrasions around the back and legs that were caused around the time of death.

McGhee suffered three gunshots to the head. One bullet entered the side of McGhee's neck and appeared to be caused while the gun was in contact with McGhee. Another bullet entered his forehead and existed next to his left ear. The third shot was fatal. It entered the back of McGhee's head, completely perforated the brain and fractured the skull before lodging behind his left eye.

Robert Wilson, a criminalist at the California Department of Justice Crime Lab, concluded two of the bullets removed from McGhee's body had been fired by [Miller's] .380–caliber Bersa handgun. The third bullet was too damaged to ascertain which gun had shot it. However, the third bullet could have been fired by [Miller's] gun. All five unfired bullets found in the magazine to [Miller's] gun matched those of the three found in McGhee's body. The three bullets found in McGhee's body would have rendered the eight-bullet-capacity magazine fully loaded.

As part of his job, McGhee hired and fired employees at his company. When employees left the company, McGhee collected their work badges. Inside McGhee's house, police found the identification badges of four former employees. Police officers interviewed these four individuals before concluding none was involved in McGhee's murder. The police ruled out the possibility any of these four individuals had been inside McGhee's house.

When interviewed by Sergeant Blake, [Miller] stated he had been drinking heavily and "kind of remembered [McGhee] had four friends over, um, or employees, I'm not sure what they were . . . . But I kind of remember (pause) them helping me clean [the broken kitchen table] up. And, I didn't see [McGhee] around. I kind of looked around the house. But I knew things weren't right because his cell phone was there, and the car was there and I just started drinking again." [Miller] had small cuts and abrasions on his hands consistent with handling broken glass.

At trial, the parties stipulated [Miller] had been convicted of a misdemeanor within 10 years of the murder charged in this case.

**Defense Evidence**

Dr. Ruth Ballard, an expert on genetics and DNA testing, testified on behalf of the defense. She explained it is not unusual to find DNA from one housemate on another housemate because DNA can be transferred by blood, saliva, semen, and skin cells. Dr. Ballard agreed it was [Miller's] DNA that was found on the Bersa handgun and McGhee's DNA was found on [Miller's] foot. However, she stated McGhee's DNA might have shown up on [Miller's] foot in some manner other than on the stains that were swabbed by the police. And, Dr. Ballard noted it was not possible to determine whether [Miller] left his DNA on the gun on the day of the murder.

Retired Los Angeles County Sheriff's Department Sergeant Frank Salerno testified as an expert on homicide investigations. Salerno stated the investigation into McGhee's death had been poorly conducted. For example, he opined the crime scene

had not been properly checked for fingerprints. Moreover, the temperature of the victim and the ambient environment are important investigative data that were not collected. Salerno also faulted the lead detective for waiting two days before examining the crime scene and not attending the autopsy.

Dr. Terri Haddix testified as an expert in forensic pathology. Based on the autopsy findings related to lividity, rigidity, coolness, decomposition, and lack of insect activity, Dr. Haddix estimated McGhee had died approximately 24 hours before his body was discovered. On cross-examination, Dr. Haddix acknowledged there was "very much a disconnect between" physical signs exhibited by McGhee's body and his lack of any activity more than 24 hours before his body was found.

One of McGhee's neighbors testified he lived two doors away from McGhee but did not hear anything like gunshots on the morning of April 15.

*People v. Miller*, No. C071677, 2014 WL 4124272, at *1-7 (Cal. Ct. App. Aug. 21, 2014).

At the conclusion of trial, the jury convicted Miller of first degree murder and being a previously convicted felon in possession of a firearm, and also found true that Miller personally discharged a firearm causing death. The trial court subsequently sentenced Miller to 50 years to life imprisonment for the murder and firearm enhancement. The court also imposed a consecutive 3-year term for being a previously convicted felon in possession of a firearm.

Through counsel, Miller appealed his conviction, arguing that: 1) the trial court erred in admitting evidence of the victim's state of mind regarding his plan to evict Miller from the victim's house; 2) admission of the victim's state of mind evidence violated California Code of Evidence § 352[2] and Miller's due process rights; and 3) the cumulative effect of those alleged errors denied him a fair trial. In a unanimous, reasoned opinion issued on August 21, 2014, the Court of Appeal agreed that admitting the victim's state of mind evidence was error, but found that the error was harmless in light of the "extremely strong evidence that was properly admitted" and that the evidence was not so imflammatory as to violate § 352 or deprive Miller of

---

[2] California Evidence Code § 352 requires the trial judge to balance the probative value of proffered evidence with its potential prejudicial effect.

a fair trial. *Miller*, 2014 WL 4124272, at *10-11. The Court of Appeal thus affirmed the judgment against Miller in its entirety. *Id.* at *12. The California Supreme Court summarily denied review on November 12, 2014.

Miller timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on June 15, 2015. Docket No. 1; *see* 28 U.S.C. § 2244(d)(1)(A). This Court, through a previously-assigned magistrate judge, granted Miller's motion to amend to include all exhausted claims raised and denied in the state courts. Docket Nos. 17, 18, 20. Respondent moved to dismiss the amended petition, arguing that it did not raise any federal claims and that, to the extent it did, such claims were unexhausted. Docket No. 21. The Court allowed Miller to file a second amended petition containing only exhausted claims, and granted a stay to allow Miller to exhaust his unexhausted claim. Docket No. 33.

Again proceeding *pro se*, Miller filed a petition for writ of habeas corpus in the California Supreme Court in which he attached his original petition for review with that court. The California Supreme Court summarily denied the petition with citations to *In re Waltreus*, 397 P.2d 1001, 1005 (Cal. 1965) (barring relitigation on habeas of claims previously raised and rejected on direct appeal) and *In re Dixon*, 264 P.2d 513, 514 (Cal. 1953) (holding that habeas relief is unavailable if "the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction"). Miller then filed a Third Amended Petition ("Petition"; Docket No. 32), which is now before the undersigned judge and ripe for adjudication.

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Miller argues that: 1) the admission of hearsay state of mind evidence violated his due process rights; 2) the trial court abused its discretion in

9

admitting the email between Simonson and McGhee; and 3) the cumulative effect of the errors warrants reversal of his conviction. Miller also requests an evidentiary hearing as to all claims.

### III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.  *Evidentiary Errors* (Grounds 1, 2)

In two related claims, Miller argues that the trial court erred in admitting as evidence of the victim's state of mind McGhee's statements to his family and friends that he planned to evict Miller for his excessive drinking. Defense counsel objected to the admission, arguing that no other evidence showed that Miller was aware of McGhee's plan to evict him from the house. Miller argued on direct appeal that the admission of the statements: 1) was erroneous under California Code of Evidence § 1250 (statement of declarant's then existing mental or physical

11

state); and 2) violated California Code of Evidence § 352 and federal due process. The Court of Appeal agreed that the evidence was not admissible under § 1250 but nonetheless concluded that the admission was harmless error in light of the evidence properly admitted. *Miller*, 2014 WL 4124272, at *9-10. The Court of Appeal rejected Miller's contentions that the evidence was unduly prejudicial in violation of § 352 and federal due process. *Id.* at *11.

Miller fares no better on federal habeas review. With respect to his contention that the erroneous admission under § 1250 was unduly prejudicial, "[i]ncorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected." *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987). Miller's challenge to the trial court's evidentiary ruling raises no federal question because "alleged errors in the application of state law are not cognizable in federal habeas corpus." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996); *see also Cooper v. Brown*, 510 F.3d 870, 1001 (9th Cir. 2007) (claim of evidentiary error "fails to present a federal question cognizable on federal habeas review"). Thus, even though the trial court erred in its application of § 1250, such error is alone not a ground for federal habeas relief. *See Estelle*, 502 U.S. at 67-68.

Moreover, this evidentiary error claim fails because the Court of Appeal's harmless determination is reasonable in light of the properly-admitted evidence against Miller, which as detailed in the Court of Appeal's decision, was quite extensive.³ *See Brecht v. Abrahamson*, 507

---

³ Other courts have admonished that harmless error review should not be confused with the sufficiency of the evidence inquiry required under *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). *See, e.g.*, *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. Sept. 8, 2015) ("Time and time again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict."). The Court's reliance on the overwhelming evidence against Miller in finding any error harmless does not simply focus on the sufficiency of the other evidence, but rather properly "look[s] at the

U.S. 619, 622, 629 (1993) (harmless error standard applies to evidentiary errors). An independent review of the record reflects that the appellate court's harmless determination does not contravene or unreasonably apply Federal law.

Nor is Miller entitled to relief on his claim that the trial court's ruling violated California Evidence Code § 352. Federal Rule of Evidence 403, the federal counterpart to § 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ." *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009). California employs a similar rule. *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence."). In his Petition, Miller argues that the trial court erred in its balancing of evidence under Evidence Code § 352. But to the extent that he argues that the admission violated state law, Miller is not entitled to habeas relief. *See Wilson v. Corcoran*, 562 U.S. 1, 4 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."); *Estelle*, 502 U.S. at 67-68.

---

influence the improperly admitted [evidence] had on the verdict," in light of a "host of factors," including the overall strength of the prosecution's case. *Id.* at 904 (citations omitted).

Moreover, Miller cannot show that the admission violates federal due process. "'The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process.'" *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995)); *see also Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir.1991) (proper analysis on federal habeas review is "whether the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair"). "The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process." *Holley*, 568 F.3d at 1101 (9th Cir. 2009). "Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id.* (citing *Williams*, 529 U.S. at 375). Absent such "clearly established Federal law," it cannot be concluded that the appellate court's ruling was an "unreasonable application." *Carey*, 549 U.S. at 77 (noting that, where the Supreme Court has not adequately addressed a claim, a federal court cannot find a state court ruling unreasonable). Miller is therefore not entitled to relief on any argument advanced in support of these grounds.

B.  *Cumulative Error* (Ground 3)

Miller additionally avers that the cumulative effect of the alleged errors identified above deprived him of a fair trial and warrant reversal of his conviction. The Ninth Circuit has stated "[t]he Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298

(1973)); *see also Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000). "Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still prejudiced a defendant." *Jackson v. Brown*, 513 F.3d 1057, 1085 (9th Cir. 2008) (quoting *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)). Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)).

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers*, 401 U.S. at 298, 302-03). Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted). In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process. *See Chambers*, 401 U.S. at 294.

Here, the Court of Appeal rejected Miller's cumulative error claim because it "determined there exists only a single, nonprejudicial error in this case," and as such, there were no multiple errors to cumulate in reversible prejudice. *Miller*, 2014 WL 4124272, at *12. Like California law, Ninth Circuit precedent provides that "[t]here can be no cumulative error when a

15

defendant fails to identify more than one error." *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012) (citing *United States v. Laurienti*, 611 F.3d 530, 551 (9th Cir. 2010). Because, as discussed more thoroughly above, the Court of Appeal did not err in finding only a single, nonprejudicial error in this case, Miller is not entitled to federal habeas relief on this claim either. Similarly, Miller does not demonstrate federal constitutional errors that would establish prejudice in the aggregate. *See, e.g.*, *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.").

C. *Evidentially Hearing*

Finally, Miller requests an evidentiary hearing as to all claims. A district court may not hold an evidentiary hearing on a claim for which a petitioner failed to develop a factual basis in state court unless the petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the petitioner guilty of the underlying offense. 28 U.S.C. § 2254(e)(2).

Where the failure to develop the factual basis for the claim in the state court proceedings is not attributable to the petitioner, to receive an evidentiary hearing, the petitioner must make a colorable claim for relief and meet one of the factors set forth in *Townsend v. Sain*, 372 U.S. 293 (1963). *Insyxiengmay v. Morgan*, 403 F.3d 657, 670-71 (9th Cir. 2005). In *Townsend*, the Supreme Court concluded that a federal habeas petitioner is entitled to an evidentiary hearing on

his factual allegations if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. *Id.* at 670 (quoting *Townsend*, 372 U.S. at 313), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *superseded by statute as stated in Williams v. Taylor*, 529 U.S. 420 (2000).

As discussed above, Miller has failed to assert a colorable claim for relief. *See Bashor v. Risley*, 730 F.2d 1228, 1233 (9th Cir. 1984) (holding an evidentiary hearing is not required on issues which can be resolved on the basis of the state court record). Because he does not cite to new laws or underlying facts that were not developed on the record before the state courts with respect to this claim, he has also failed to satisfy his burden of proof under 28 U.S.C. § 2254(e)(2). Miller's request for an evidentiary hearing must therefore also be denied.

## V. CONCLUSION AND ORDER

Miller is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is directed to enter judgment accordingly.

Dated: March 22, 2019.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge